UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| TOBY ZEPEDA, | § | |
| | § | |
| Plaintiff, | § | Cv. No. SA:11-CV-901-DAE |
| | § | |
| vs. | § | |
| | § | |
| SHANE Q. SIZEMORE, Individually; | § | |
| and ABEL BARRIENTES, | § | |
| Individually, | § | |
| | § | |
| Defendants. | § | |

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT

On August 22, 2013, the Court heard oral argument on the Motion for

Summary Judgment filed by Defendants Shane Q. Sizemore and Abel Barrientes

(collectively, "Defendants").  (Doc. # 74 ("Mot.").)   Mark Anthony Sanchez,

Esq., appeared on behalf of Plaintiff Toby Zepeda; Nathan Mark Ralls, Esq.,

appeared on behalf of Defendants.  After careful consideration of the Motion and

the supporting and opposing memoranda, and in light of the parties' arguments at

the hearing, the Court, for the reasons that follow, **GRANTS** Defendants' Motion.

BACKGROUND

I.      Background Facts

This case arises out of allegedly excessive force that Plaintiff Toby

Zepeda contends two officers of the San Antonio Police Department ("SAPD")

1

used against him.  Two videotapes—a surveillance video and a cell phone video

posted on Youtube—recorded most of the events underlying Plaintiff's claims.

(See Mot. Exs. A, B.)[1]

        The incident that forms the basis of this lawsuit occurred on

November 1, 2009 (the night of Halloween), at about 2:15 a.m., in downtown San

Antonio, in the elevator lobby to a parking garage.  Plaintiff left Medusa's Night

Club shortly after it closed at 2:00 a.m.  (Zepeda Depo. 36:16–19.)  In the

previous hour and a half, Plaintiff had drunk four beers.  (Id. at 39:24–40:9,

57:11–18.)  Upon leaving Medusa's, Plaintiff saw a female friend of his arguing

with another girl outside the parking garage.  (Id. at 38:23–39:12.)  Plaintiff

attempted to break up the fight, at which point the security officer on duty

requested that Plaintiff and his friend enter the lobby of the parking garage in

order to separate the parties and defuse the situation.  (Id. at 39:16–20.)  The

surveillance video shows Plaintiff's friend, recognizable by her Wonder Woman

---

[1]  These videotapes significantly aid the Court's understanding of these events.
See Poole v. City of Shreveport, 691 F.3d 624, 625 n.1 (5th Cir. 2012) (noting that
courts should view purported facts "'in the light depicted by the videotape'")
(quoting Scott v. Harris, 550 U.S. 372, 380 (2007)); Carnaby v. City of Houston,
636 F.3d 183, 187 (5th Cir. 2011) ("A court of appeals need not rely on the
plaintiff's description of the facts where the record discredits that description but
should instead consider 'the facts in the light depicted by the videotape.'")
(quoting Scott, 550 U.S. at 381).  While the parties dispute the tapes' content,
neither disputes the tapes' admissibility.

costume, entering the lobby at time stamp 3:13:30 a.m.[3]  The acting security

officer can be seen attempting to prevent Plaintiff's friend from leaving the lobby.

At around 3:13:45, two other girls enter the lobby, and they appear to be fighting

with someone off screen.  At around 3:13:48, Plaintiff first appears in the bottom

right-hand corner of the screen wearing a red, long-sleeve shirt.  At 3:13:52,

Plaintiff can be seen attempting to pull his friend away from the other women

while the acting security officer attempts to restrain another woman.  At 3:13:54,

Plaintiff's friend breaks free from his grasp and exits the lobby, at which point the

acting security officer runs out of the frame, followed by the woman he was

attempting to subdue and by Plaintiff.

   At 3:14:04, the acting security officer reenters the frame holding the

arms of a woman dressed as a devil.  The officer then leaves the woman dressed as

a devil in the lobby and goes back outside.  At 3:14:11, Plaintiff reappears in the

bottom right-hand corner of the screen, again attempting to subdue his friend.

Seconds later, many other individuals enter the lobby.  At 3:14:26, an individual in

a yellow shirt rushes at Plaintiff and attempts to attack him.[4]  The acting security

---

[3] It appears that the time stamp on the video is one hour fast.  (Zepeda Depo. 184:22–185:5.)

[4] The Complaint alleges that the individual who lunged at Plaintiff was former-Defendant Officer Anguiano.  However, Plaintiff conceded during his deposition that Officer Anguiano was the acting security guard who attempted to restrain the man in the yellow shirt and that Anguiano did not attack Plaintiff. (See Zepeda Depo. 50:17–20, 64:15–65:18.)

officer attempts to restrain the man in the yellow shirt.  However, by 3:14:33, the

man in the yellow shirt, a man in a green shirt, and a man in a light blue shirt have

pushed Plaintiff into the corner of the lobby.  (Zepeda Depo. 113:25–118:6.)  At

this time, the civilian men "start[ed] throwing punches." (<u>Id.</u> 115:3–13.)  Plaintiff

"was trying to go down to the prone position," but the civilian men "picked [him]

up from the floor, took [him] over here, picked [him] up from the floor and took

[him] back that way."  (<u>Id.</u>)  These men were kicking and punching Defendant

"fast" and "hard" all over his upper and lower body, including his ribs, head, and

shoulders.  (<u>Id.</u> at 116:10–118:6.)

   By 3:14:37, at least eighteen other men and women have entered the

lobby, some of whom are fighting, grabbing each other, and/or running.  At

3:14:40, the acting security officer can be seen attempting to subdue one of the

women in the corner of the lobby.

   At 3:14:43, Defendant Sizemore first appears in the bottom

right-hand corner of the screen.  (Mot. Ex. C at 2 ("Sizemore Aff.").)  He is

wearing black pants, a blue and black short-sleeve shirt that says POLICE, and a

dark colored, long-sleeved undershirt.  He has a full head of hair that is closely

cropped on the sides.  Defendant Sizemore can be seen attempting to help the

acting security officer subdue the woman.  Then, at 3:14:45 a.m., while

Sizemore's back is turned to the elevators and the lobby doors, a stream of men

enters the lobby, and a number of the men walk toward the opposite side of the lobby (the bottom left-hand side of the screen).  At 3:14:48, Defendant Sizemore turns around and walks in the same direction, where it appears that a struggle is taking place.  Behind Sizemore, many of the people who have entered the lobby are struggling with each other.  At 3:14:54, another police officer, dressed entirely in black, enters the lobby and attempts to break up that fight.  Plaintiff agreed at his deposition that by this point the scene could be described as a "melee." (Zepeda Depo. 122:21–123:6.)

At the same time, Defendant Sizemore, along with a few other men, can be seen in the bottom left-hand side of the frame, apparently attempting to subdue someone.  At 3:15:19, Plaintiff reappears, and three uniformed police officers, including Defendant Sizemore, can be seen struggling with Plaintiff.  The YouTube video, which shows the same incident from another angle, shows an unidentified officer (who is not dressed in an SAPD uniform[5]) directing a kick at Plaintiff.  Plaintiff testified that this man kicked him twice in the ribs.  (Zepeda Depo. 131:13–132:10.)

During this struggle, Plaintiff, Defendant Sizemore, and two unidentified SAPD officers move to the corner of the lobby, to the left of the elevators (the bottom left-hand side of the frame).  Plaintiff testified at his

_____

[5] Plaintiff asserted during his deposition that this officer was wearing a Bexar County Sheriff's uniform.  (Zepeda Depo. 58:2–17.)

deposition that he did not move to the corner of the lobby voluntarily; he claims he was "already on the floor in the prone position" and the officers "pick[ed] [him] back up" and took him to the corner, where they put him back down and started hitting him. (Zepeda Depo. 124:15–125:2.)[6]

Once Plaintiff has moved to the corner of the lobby, he is outside the frame of the security camera. However, approximately thirty-two seconds into the YouTube video, Defendant Sizemore and the two unidentified officers can be seen struggling with Plaintiff in the corner of the lobby. Sizemore is standing on the left side of Plaintiff (Plaintiff's right side), pulling at Plaintiff's right arm and apparently attempting to bring him under control. Another officer, who is bald, is standing behind Plaintiff; and an officer wearing a bike helmet is standing on Plaintiff's left, attempting to grab Plaintiff's arm. In the YouTube video, the bald officer behind Plaintiff, who is not a defendant in this case, can be seen hitting Plaintiff in the upper back or head at least four times. It is not clear from the video whether the bald officer hit Plaintiff with an open hand or with a fist.

At 3:15:27 on the surveillance video, Plaintiff can be seen moving toward the middle of the lobby while the officers are still struggling with him. At 3:15:33, a number of other officers enter the room and attempt to assist with the arrest. It is at this time that Defendant Barrientes is first seen. At 3:15:34, he can

_____

[6] The YouTube video does not show that Plaintiff was ever lying prone on the floor. However, the video does not provide an unobstructed view.

be seen standing behind two officers, one of whom is wearing a bike helmet.
(Mot. Ex. D ("Barrientes Aff.").)

At 3:15:39, three officers can be seen attempting to subdue Plaintiff.
At this time, Defendants Sizemore and Barrientes, who can be seen on the left side
of the screen, are not touching Plaintiff.  Shortly thereafter, Defendant Barrientes
can be seen attempting to grab Plaintiff's legs while other officers are attempting
to pin him to the ground.  At 3:15:47, Sizemore can be seen bending down to
assist the other officers, but the camera's view of his hands is blocked by the other
officers.  During this time, the video appears to show Plaintiff twisting, turning,
and kicking his legs.

At 3:15:59, Defendant Barrientes can be seen placing Plaintiff in a
choke hold.  In the video, Plaintiff is lying face-up on top of Barrientes, who has
his back against the wall next to the elevator.  Another officer can be seen on top
of Plaintiff, pinning him down.  Plaintiff appears to be struggling.  Seconds later,
as the officer who was on top of Plaintiff stands up, Plaintiff appears to kick his
legs to the side, leading a number of other officers to approach and grab his legs.

At 3:16:09, Defendant Barrientes and at least two other officers flip
Plaintiff onto his stomach.  At 3:16:13, four officers, including Defendant
Barrientes, can be seen pinning Plaintiff to the ground, with two officers holding
his legs and one officer holding each arm.  Defendant Sizemore is not in the

7

frame.  At 3:16:16, Defendant Barrientes places his right knee on Plaintiff's neck or upper shoulder, pinning him to the ground face-down, and uses his hands to assist the other officers in handcuffing Plaintiff.  Plaintiff testified at his deposition that it was at this moment—the moment in which he was handcuffed—that he first realized he was dealing with police officers.  (Zepeda Depo. 128:15–129:17.)  Until that point, Plaintiff insists, he believed he was dealing with civilians.  (Id.)

At 3:16:32, the officers appear to have successfully handcuffed Plaintiff, and Defendant Barrientes stands up.  The other officers stand, too, and most begin to exit the lobby.  At 3:16:41, however, Plaintiff flips over onto his back, leading Defendant Barrientes and another officer to bend down and flip Plaintiff back onto his stomach.  At 3:16:43, Defendant Barrientes again places his right knee on Plaintiff's neck or upper shoulder, apparently to prevent Plaintiff from flipping over again.  At 3:16:45, Plaintiff appears to flail his legs, leading a third officer to grab them.  At 3:17:01, Defendant Barrientes, who is still pinning Plaintiff to the ground with his knee, appears to say something to Plaintiff.  At 3:17:33, Defendant Barrientes again appears to speak with Plaintiff.  By this time, the lobby has largely been cleared out.  At 3:18:14, the officer holding Plaintiff's legs stands up, at which point Defendant Barrientes is the only officer touching Plaintiff.  Barrientes is still pinning Plaintiff down with his right knee; however,

he appears to be crouching in such a way that much of his weight is borne by his left leg.

At 3:18:34, Defendant Sizemore reappears.  He can be seen walking around the lobby but does not make contact with Defendant.  At 3:19:06, the video cuts out, with Defendant Barrientes still pinning Plaintiff to the floor.  However, shortly thereafter Defendant Barrientes permitted Plaintiff to sit up, and Plaintiff sat in the elevator lobby for about an hour before being taken to the police station. (Zepeda Depo. 188:15–18.)  Plaintiff states that he was not mistreated after he sat up.  (Id. at 197:23–198:3.)

Plaintiff alleges that as a result of the officers' actions he "sustained serious injuries to his person, including but not limited to, a sprained knee, shoulder injury and numerous bruises to his head, back, and extremities."  (Compl. ¶ 15.)  Following the incident, Plaintiff went to jail for approximately 26 hours. (Zepeda Depo. 70:5–7.)  Shortly thereafter, Plaintiff was charged with assault on a public servant based on a complaint from Officer Anguiano.  (Compl. ¶ 33; Resp. Ex. 3.)

Plaintiff attests that he went to the emergency room upon his release from jail.  (Id. 70:5–71:25.)  X-rays indicated that he had no broken bones, but his ribs were bruised.  (Id.)  Plaintiff also asserts that he had "a little bit of swelling on

[his] face" and "little scratches" and that his throat hurt from "when they were

choking [him]."  (Id.)

Plaintiff testified at his deposition that he went to see Dr. Wong a

couple of days later and that at that time he "could barely walk"; that he "couldn't

cough," because his "ribs would hurt"; that he "could barely speak" because of the

injuries to his throat; that his back hurt; and that he had "pain everywhere."  (Id. at

72:22–73:17.)

Plaintiff was put on unpaid leave from his job as a prison security

guard as a result of the criminal charges resulting from this incident, though he

received a salary until January 12, 2010, by using his accrued comp time.  (Zepeda

Depo. 80:12–81:13.)  On July 12, 2010, Plaintiff was fired (id. at 80:14–20), and

he has not returned to work, allegedly due to his injuries (id. at 82:5–85:13).  At

the time of his deposition, Plaintiff insisted that he could "barely" pick up his arms

and "barely do a certain rotation."  (Id. at 74:7–11.)  He also attested that he still

had all the same symptoms: throat problems, shoulder issues, and neck pain.  (Id.

at 76:21–77:18.)

II.   Procedural History

On October 31, 2011, Plaintiff filed a Complaint with this Court

(doc. # 1), naming as Defendants the City of San Antonio, Texas; Price Protective

Services, Inc.; Bexar County, Texas; and Shane Q. Sizemore, Abel Barrientos,[7] Antonio Flores, Craig R. Bottiglieri, John Doe I, John Doe II, and John Anguiano, all in their individual capacities.  Plaintiff brought claims pursuant to 42 U.S.C. § 1983, alleging that Defendants had deprived him of his Fourth Amendment rights by using excessive force, failing to intervene to prevent his injuries, falsely arresting Plaintiff, and maliciously prosecuting him. (Compl. ¶ 23.)  Plaintiff also brought a number of state-law claims, including claims for intentional infliction of emotional distress, false arrest and false imprisonment, and assault and battery.  (Id. ¶¶ 34–41.)  The Complaint sought medical expenses, lost income, attorneys' fees, punitive damages, and damages for pain and suffering, emotional and mental distress, and "personal humiliation and shock."  (Compl. ¶¶ 42–45.)

On December 27, 2011, Bottiglieri and Sizemore jointly filed their Original Answer to the Complaint.  (Doc. # 3.)  On March 29, 2012, the City of San Antonio filed its Answer.  (Doc. # 8.)  On the following day, Anguiano and Price Protective Services jointly filed their Answer.  (Doc. # 9.)  On April 13, 2012, Barrientes and Flores jointly filed their Answer.  (Doc. # 10.)  On April 20, 2012, Anguiano and Price Protective Services filed an Amended Answer. (Doc. # 11.)

---

[7] Now known to be Abel Barrientes.

On October 22, 2012, Bexar County filed a Motion to Dismiss and Subject Thereto, Answer and Affirmative Defenses.  (Doc. # 46.)  On November 7, 2012, Plaintiff filed a Notice of Voluntary Dismissal that dismissed all claims against Bexar County.  (Doc. # 48.)

On November 20, 2012, Anguiano and Price Protective Services filed a Motion for Summary Judgment and Motion to Sever.  (Doc. # 50.)  Shortly thereafter, on November 29, 2012, Plaintiff filed four Stipulations of Dismissal, dismissing all claims against Anguiano, Bottiglieri, Flores, and Price Protective Services.  (Docs. ## 51–54.)  On January 3, 2012, Bottiglieri and Sizemore jointly filed an Amended Answer.  (Doc. # 56.)

On March 1, 2013, the City of San Antonio filed a Motion for Summary Judgment.  (Doc. # 71.)  On April 11, 2013, Plaintiff filed a Stipulation of Dismissal that dismissed all claims against the City of San Antonio. (Doc. # 79.)

Also on March 1, 2013, the two remaining Defendants, Barrientes and Sizemore, filed the Motion for Summary Judgment that is now before the Court.  (Doc. # 74.)  On April 11, 2013, Plaintiff filed a Response in opposition to the Motion.  (Doc. # 81.)  On April 18, 2013, Defendants Barrientes and Sizemore filed their Reply.  (Doc. # 82.)

<u>STANDARD OF REVIEW</u>

Summary judgment is granted under Federal Rule of Civil Procedure 56 when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Cannata v. Catholic Diocese of Austin, 700 F.3d 169, 172 (5th Cir. 2012). The main purpose of summary judgment is to dispose of factually unsupported claims and defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. Id. at 323. If the moving party meets this burden, the non-moving party must come forward with specific facts that establish the existence of a genuine issue for trial. ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc., 699 F.3d 832, 839 (5th Cir. 2012). In deciding whether a fact issue has been created, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." Brown v. City of Houston, 337 F.3d 539, 541 (5th Cir. 2003). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)

(quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

<u>DISCUSSION</u>

Defendants Sizemore and Barrientes argue that they are entitled to summary judgment on Plaintiff's state-law tort claims as a matter of law under the election-of-remedies provision of the Texas Tort Claims Act ("TTCA").  (Mot. at 2.)  Defendants further assert that they are entitled to qualified immunity as to Plaintiff's claims of excessive force, false arrest, seizure, and failure to intervene, because their actions were reasonable under the totality of the circumstances.  (Id.)  Finally, Defendants assert that they are entitled to summary judgment on Plaintiff's malicious-prosecution claim as a matter of law.  (Id.)

I.     <u>Plaintiff's State-Law Tort Claims</u>

Plaintiff has alleged a number of state-law intentional-tort claims, including intentional infliction of emotional distress (Compl. ¶¶ 34–35), assault and battery (id. ¶¶ 38–41), and false arrest and/or false imprisonment (id. ¶¶ 36–37).  For the reasons that follow, Defendants are entitled to summary judgment on these claims as a matter of law.

A.     <u>Intentional Infliction of Emotional Distress</u>

Defendants argue that intentional infliction of emotional distress ("IIED") is a "gap-filler" tort.  (Mot. at 3.)  "To establish a cause of action for

14

[IIED]," Defendants insist, "a plaintiff must establish [that] there is no alternative

cause of action that would provide a remedy for the severe emotional distress

caused by a defendant's conduct."  (Mot. at 3.)  For support, they point to the

Supreme Court of Texas's decision in Hoffmann-LaRoche Inc. v. Zeltwanger,

wherein the court explained that the "clear purpose" of the tort is to "supplement

existing forms of recovery by providing a cause of action for egregious conduct

that might otherwise go unremedied."  144 S.W.3d 438, 447 (Tex. 2004) (quoting

Std. Fruit and Vegetable Co. v. Johnson, 985 S.W.2d 62, 68 (Tex. 1998)).

Because Plaintiff's IIED claim "arises out of the same facts that give rise to

Plaintiff's claims under 42 U.S.C. § 1983, and [because] 42 U.S.C. § 1983

provides for the recovery [of] mental anguish damages for a prevailing plaintiff,"

insist Defendants, Defendants are entitled to summary judgment as a matter of

law.  (Mot. at 3–4.)  Plaintiff did not address this argument in his Response.

Defendants are correct: In Texas, "intentional infliction of emotional

distress is a 'gap-filler' tort never intended to supplant or duplicate existing

statutory or common-law remedies."  Creditwatch, Inc. v. Jackson, 157 S.W.3d

814, 816 (Tex. 2005) (citing Hoffmann-La Roche, 144 S.W.3d at 447).  Thus,

"where the gravamen of a plaintiff's complaint is actually another tort, such as a

constitutional civil rights violation or false imprisonment, a cause of action for

intentional infliction of emotional distress is not available."  Burkett v. City of El

Paso, 513 F. Supp. 2d 800, 825 (W.D. Tex. 2007).  In Holguin v. Lopez, for

example, the court held that the plaintiff's IIED claim against a police officer

failed as a matter of law because it was "based on the same operative facts as his

claims for constitutional violations . . . ."  584 F. Supp. 2d 921, 928 (W.D. Tex.

2008); accord Almond v. Tarver, 468 F. Supp. 2d 886, 905 (E.D. Tex. 2006)

("Because § 1983 and the common law tort of assault are the appropriate avenues

for redress of Almond's alleged injuries, his intentional infliction of emotional

distress claim fails as a matter of law."); Phillips v. U.P.S., No. 3:10-CV-1197,

2011 WL 2680725, at *14 (N.D. Tex. June 21, 2011) (dismissing plaintiff's IIED

claim because it "relie[d] on the same alleged conduct" as her Title VII claims).

Plaintiff explicitly bases his IIED claim on the same operative facts

underlying his § 1983 claims and his other state-law tort claims.  Compare

Compl. ¶¶ 20, 36, 38 (indicating that the allegations in Paragraphs 13 through 19

form the basis of Plaintiff's § 1983 claims and his state-law claims for false

arrest/false imprisonment and assault and battery), with id. ¶ 34 (indicating that

the allegations in Paragraphs 13 through 19 form the basis of Plaintiff's IIED

claim).  More specifically, Plaintiff alleges that Defendants "acted intentionally

and/or recklessly when assaulting him and further alleges that such conduct was

extreme and outrageous."  (Id. ¶ 35 (emphasis added).)  Because "the gravamen of

[Plaintiff's] complaint is the type of wrong that the statutory remedy was meant to

cover"—i.e., because Plaintiff has a remedy under § 1983—he "cannot maintain an intentional infliction claim . . . ." Watkins v. Tex. Dep't of Crim. Justice, 269 F. App'x 457, 464 (5th Cir. 2008) (quoting Hoffman-La Roche, 114 S.W.3d at 447–68).  Accordingly, Defendants are entitled to summary judgment on Plaintiff's IIED claim.

    B.    Assault and Battery and False Arrest/Imprisonment

        Defendants insist that Plaintiff's remaining state-law claims must be dismissed pursuant to the election-of-remedies provisions of the TTCA, Texas Civil Practice and Remedies Code § 101.106.  (Mot. at 4.)  That section provides, in relevant part:

> (f) If a suit is filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment and if it could have been brought under this chapter against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only.  On the employee's motion, the suit against the employee shall be dismissed unless the plaintiff files amended pleadings dismissing the employee and naming the governmental unit as defendant on or before the 30th day after the date the motion is filed.

Tex. Civ. Practice & Remedies Code § 101.106(f) (emphasis added).  Defendants point out that Plaintiff, in the Complaint, "clearly states that Defendants were acting as employees of the San Antonio Police Department, under color of state law and in the course and scope of their employment and authority with the San Antonio Police Department at the time of the incident made the basis of this suit." (Mot. at 4; accord Compl. ¶¶ 6, 7.)  Moreover, insist Defendants, "[r]esponding to

a riot is clearly within the general course and scope of the Defendants'

employment."  (Id.)  Accordingly, Defendants argue that "Plaintiff's suit [must be]

considered to be against Defendants in Defendants' official capacities only," and

Plaintiff's state-law claims should be dismissed as a matter of law.  (Id.)

            Plaintiff responds that, in order to warrant dismissal pursuant to

§ 101.106(f), a claim must meet two requirements: First, as Defendants note, the

claim must be "based on conduct within the general scope of [a governmental

unit's] employee's employment"; and second, the claim must be one that "could

have been brought under this chapter against the governmental unit . . . ."

(Resp. at 6–7 (quoting Tex. Civ. Practice & Remedies Code § 101.106(f)

(emphasis added).)  Thus, insists Plaintiff, § 101.106(f) "is not applicable for one

simple reason: Assault and battery claims cannot be brought under the chapter

against a governmental entity."  (Resp. at 6.)

            Plaintiff cites no authority for the proposition that assault and battery

claims "simply cannot be brought—under any circumstances whatsoever—against

a governmental entity."  (Resp. at 7.)  However, what Plaintiff appears to mean is

not that it is impossible, under any circumstances imaginable, to bring an assault

and battery claim against a governmental agency; it is that the TTCA currently

does not waive sovereign immunity with respect to such claims.  Plaintiff insists

that it "would be perverse" to dismiss his claims against the individual defendants

18

"so that [he] can then improperly sue the City and be imperiled by the inevitable dismissal (due to a lack of waiver of immunity) of such claims[.]"   (Id.)

Dismissal is precisely what the Supreme Court of Texas's holding in Franka v. Velasquez, 332 S.W.3d 367 (Tex. 2011), requires, however.  Prior to Franka, a majority of Texas courts had interpreted the phrase "could have been brought under this chapter against the governmental unit" to mean that the suit must be one for which the state has waived its sovereign immunity.  See id. at 382 n.67 (collecting cases).  In Franka, however, the supreme court explicitly rejected that reasoning, see id., holding that, for purposes of § 101.106(f), a common-law tort action "could have been brought under" the TTCA regardless of whether the Act waives immunity for that action.  See id. at 385; id. at 388 (Medina, J., dissenting) (construing the majority decision as holding that the phrase "could have been brought under this chapter against the governmental unit" as "includ[ing] all tort claims filed against a governmental employee individually without regard to whether the government has consented to be sued").  In other words, "the Franka court expressly concluded that . . . the Legislature [had] made whatever remedy the Tort Claims Act provides against the governmental unit a claimant's exclusive remedy for damages allegedly caused by common-law torts committed by a government employee in the scope of her employment."  Univ. of

<u>Tex. Health Sci. Ctr. at Houston v. Crowder</u>, 349 S.W.3d 640, 649 (Tex. App. 2011) (emphases added).

Plaintiff insists that the "hard-to-follow opinion" in <u>Franka</u> should not be read so broadly.  (Resp. at 6.)  "[T]he Court in <u>Franka</u>," argues Plaintiff, "was dealing with a medical malpractice action that can be—albeit in limited circumstances—brought against a governmental entity."  (<u>Id.</u>)  By contrast, insists Plaintiff, there are no circumstances under which a plaintiff could sue a governmental entity for assault and battery.[8]  (<u>Id.</u>)

The Court is unconvinced.  First, the Court can find no support for Plaintiff's restrictive reading of <u>Franka</u> in the text of that opinion.  Instead, the <u>Franka</u> majority explained that a claim "could have been brought under the [Texas Tort Claims] Act" if that claim "is in tort and not under another statute that independently waives immunity."  332 S.W.3d at 381; <u>accord</u> <u>Fontenot v. Stinson</u>, 369 S.W.3d 268, 272–73 (Tex. App. 2011) (explaining that the phrase "under this chapter" refers to any common-law tort claim but does not include, for example, federal statutory claims brought under 42 U.S.C. § 1983).  The <u>Franka</u> dissent also interpreted the majority opinion broadly, lamenting that it "effectively reads the

---

[8] Again, Plaintiff does not seem to be arguing that assault-and-battery claims are categorically different from other common-law tort claims such that it would be <u>impossible</u> to bring such claims against a governmental entity; he is arguing that Texas Civil Practice and Remedies Code § 101.057(2) specifically does not waive sovereign immunity for assault-and-battery claims.

'could have been brought' condition out of the statute . . . ."  <u>Franka</u>, 332 S.W.3d

at 388 (Medina, J., dissenting).  Finally, subsequent opinions from the Texas

Courts of Appeals have agreed that <u>Franka</u> broadly forecloses common-law tort

claims "against a government employee in his individual capacity if he was acting

within the scope of employment.'" <u>Dung Ngoc Huynh v. Washington</u>, 339 S.W.3d

309, 311 (Tex. App. 2011) (quoting <u>Franka</u>, 332 S.W.3d at 381); <u>accord</u> <u>Crowder</u>,

349 S.W.3d at 649; <u>Williams v. Nealon</u>, 394 S.W.3d 9, 12 (Tex. App. 2012);

<u>Redburn v. Garrett</u>, 13-12-00215-CV, 2013 WL 2149699, at *7 (Tex. App. May

16, 2013).

   To the extent that Plaintiff would like this Court to ignore the

Supreme Court of Texas's holding in <u>Franka</u>, the Court rejects that request.  The

responsibility of the federal courts with respect to state-law questions is not to

make the law; it is merely to ascertain and apply it.  <u>See</u> <u>Polk Cnty., Ga. v. Lincoln</u>

<u>Nat. Life Ins. Co.</u>, 262 F.2d 486, 490 (5th Cir. 1959).  While state courts can

overrule their prior decisions, federal courts cannot do so.  <u>Id.</u> (citing <u>Ill. Central</u>

<u>R.R. Co.</u>, 312 U.S. 630, 631 (1941)).  Accordingly, it is not this Court's place to

question the soundness of the Supreme Court of Texas's interpretation of Texas

law.

   For similar reasons, the Court rejects Plaintiff's final argument: that

the holding of <u>Franka</u> as described above violates the Open Courts provision of

the Texas Constitution.  (Resp. at 7.)  The Open Courts provision states that "[a]ll

courts shall be open, and every person for an injury done him, in his lands, goods,

person or reputation, shall have remedy by due course of law." Tex. Const. Art. I,

§ 13.  Among other things, the Open Courts provision "prohibits the Legislature

from unreasonably restricting common law causes of action."  Thomas v. Oldham,

895 S.W.2d 352, 357 (Tex. 1995) (citing Tex. Ass'n of Bus. v. Tex. Air Control

Bd., 852 S.W.2d 440, 448 (Tex. 1993)).  The Franka court was not presented with

an Open Courts challenge, but it did address the issue in dicta:

> We recognize that the Open Courts provision of the Texas Constitution
> "prohibits the Legislature from unreasonably abrogating well-established
> common-law claims," but restrictions on government employee liability
> have always been part of the tradeoff for the Act's waiver of immunity,
> expanding the government's own liability for its employees' conduct, and
> thus "a reasonable exercise of the police power in the interest of the general
> welfare."

Franka, 332 S.W.3d at 385 (internal citations omitted).  Thus, as the Texas Court

of Appeals recently noted in Williams v. Nealon, "the [Texas] supreme court has

indicated that an open courts challenge to section 101.106(f) would fail because

the restriction is reasonable when balanced against the statute's purpose."  394

S.W.3d at 12.  Because Plaintiff points to no contrary state-court precedent, this

Court has no reason to conclude that § 101.106(f) violates the Open Courts

provision of the Texas Constitution.

For the foregoing reasons, Defendants are entitled to summary judgment on Plaintiff's common-law intentional-tort claims.

II.     Plaintiff's § 1983 Claims

Plaintiff has alleged that Defendants deprived him of his Fourth Amendment rights and privileges by (1) using excessive force in the course of their custody of Plaintiff; (2) seizing Plaintiff in an unnecessarily abusive manner; (3) falsely arresting and detaining Plaintiff; (4) failing to intervene where such intervention would have prevented the constitutional violations and/or Plaintiff's injuries; and (5) falsely and maliciously charging Plaintiff with the commission of crimes without probable cause to believe such crimes occurred.  Defendants assert that they are entitled to qualified immunity on the first four claims and to summary judgment on the fifth as a matter of law.

A.      Defendants Are Entitled to Qualified Immunity on Plaintiff's Claims of Excessive Force, "Abusive" Seizure, False Arrest/Imprisonment, and Failure to Intervene

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  "Qualified immunity balances two

23

important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231.  The Supreme Court has characterized qualified immunity as protecting "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

      Courts utilize a two-part analysis to resolve government officials' qualified-immunity claims.  The first prong asks whether the defendant's conduct violated a constitutional right. Terry v. Hubert, 609 F.3d 757, 761 (5th Cir. 2010) (citing Pearson, 555 U.S. at 232).  The second prong asks whether the defendant's conduct was objectively unreasonable in light of clearly established law at the time of the violation.  Id.  A court may begin its analysis with either prong, but both questions must be answered in the affirmative for liability to attach.  Pearson, 555 U.S. at 236.  Thus, "[e]ven if the official's conduct violate[d] a constitutional right, he is entitled to qualified immunity if the conduct was objectively reasonable." Rankin v. Klevenhagen, 5 F.3d 103, 105 (5th Cir. 1993) (quoting Spann v. Rainey, 987 F.2d 1110, 1114 (5th Cir. 1993)).

      A qualified-immunity defense alters the usual summary-judgment burden of proof.  See Brown, 623 F.3d at 253.  "Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by

establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law."  Id.; see also Newman v. Guedry, 703 F.3d 757, 761 (5th Cir. 2012) ("Although qualified immunity is nominally an affirmative defense, the plaintiff bears a heightened burden to negate the defense once properly raised.") (internal quotation marks omitted).  A defendant who claims qualified immunity in good faith has no obligation to produce evidence. See Beck v. Tex. State Bd. of Dental Examiners, 204 F.3d 629, 633–34 (5th Cir. 2000).  Thus, defendants who claim qualified immunity in good faith "are entitled to qualified immunity . . . unless (1) [the plaintiff] has adduced sufficient evidence to raise a genuine issue of material fact suggesting their conduct violated an actual constitutional right, and (2) the officers' actions were objectively unreasonable in light of clearly established law at the time of the conduct in question."  Newman, 703 F.3d at 761 (emphases added; internal quotation marks omitted).  "The defendant[s'] acts are held to be objectively reasonable unless all reasonable officers in the defendant[s'] circumstances would have then known that the defendant[s'] conduct violated the United States Constitution or the federal statute as alleged by the plaintiff."  Thompson v. Upshur County, Tex., 245 F.3d 447, 457 (5th Cir. 2001).

In order to overcome the defense of qualified immunity at the summary judgment stage, the plaintiff cannot rest on conclusory allegations or

assertions; he must demonstrate genuine issues of material fact regarding the

reasonableness of the defendant's conduct.  See Michalik, 422 F.3d at 262.

However, while the plaintiff bears the burden of negating qualified immunity, all

inferences are still drawn in his favor.  Poole, 691 F.3d at 630.[9]

By establishing that they are city police officers (see Mot. Exs. C, D;

doc. # 3 ¶ 8; doc. # 10 ¶ 7), Defendants have met their burden of showing that they

are governmental officials whose positions involve the exercise of discretion.  See,

e.g., Curtis v. Anthony, 710 F.3d 587, 594–600 (5th Cir. 2013) (per curiam)

(recognizing that police officers may be entitled to qualified immunity).  Mindful

---

[9] Plaintiff incorrectly asserts that the burden is on Defendants to demonstrate that
they are entitled to qualified immunity, insisting that Defendants are not entitled to
qualified immunity because they have "offer[red] insufficient evidence concerning
the underlying events forming the basis of Plaintiff's complaints."  (Resp. at 11.)
However, Plaintiff misunderstands the qualified immunity analysis: While
Defendants bore the initial burden of pleading in good faith that they were
government officials entitled to qualified immunity, once they did so the burden
shifted to Plaintiff to put forth evidence to show that there are genuine issues of
material fact concerning the reasonableness of Defendants' conduct.  See Beck,
204 F.3d at 633–34 ("Beck argues that the burden rests on the defendants to
articulate facts to support their claim of immunity.  Our well established summary
judgment jurisprudence clearly shows otherwise.  The moving party is not
required to put forth evidence to meet its summary judgment burden for a claim of
immunity.  It is sufficient that the movant in good faith pleads that it is entitled to
absolute or qualified immunity."); Estate of Davis v. City of N. Richland Hills,
406 F.3d 375, 380 (5th Cir. 2005) ("We do not require that an official demonstrate
that he did not violate clearly established federal rights; our precedent places that
burden upon plaintiffs."); Bazan ex rel. Bazan v. Hidalgo Cnty., 246 F.3d 481, 490
(5th Cir. 2001) ("[B]ecause Trooper Vargas pleaded qualified immunity as an
affirmative defense, the burden of negating the defense lies with Plaintiffs.  Again,
they cannot rest on the pleadings; instead, they must show genuine issues of
material fact concerning the reasonableness of Trooper Vargas' conduct.").

of the fact that it is therefore Plaintiff's burden to produce evidence to overcome Defendants' claim of qualified immunity, the Court notes at the outset that, while each Defendant submitted a sworn affidavit detailing his actions on the night of November 1, 2009, Plaintiff did not submit an affidavit of his own.[10]  The three pieces of evidence that Plaintiff submitted in opposition to Defendants' Motion are: (1) sixteen pages excerpted from the transcript of Plaintiff's October 30, 2012 deposition (Resp. Ex. 1 ("Zepeda Depo.")); (2) a two-page medical report from the offices of Dr. Pablo Guajardo (Resp. Ex. 2); and (3) the incident report filed by Defendant Sizemore on November 10, 2009 (Resp. Ex. 3).  Accordingly, the Court looks to these three pieces of evidence,[11] along with the evidence submitted by Defendants,[12] to determine whether Plaintiff has met his burden of creating a

---

[10]  The Court reiterates that Plaintiff appears to have misunderstood his burden with regard to Defendants' claim of qualified immunity.  (See Resp. at 5 (arguing that "Defendants have failed to sustain their burden of proof and persuasion in regard to their assertion of qualified immunity and their Defendants' Motion for Summary Judgment must therefore be denied").)

[11]  Because it is part of the record, the Court will look to Plaintiff's entire deposition for evidence to support his claims rather than merely the sixteen pages he has excerpted.

[12]  Defendants also submitted the affidavit of former chief of police Albert Ortiz.  Plaintiff objects to Ortiz's testimony on the ground that it goes to the ultimate issue in this case: whether the amount of force Defendants used was reasonable.  (Resp. at 2.)  Plaintiff does not specify which portions of Ortiz's testimony he finds objectionable.  However, to the extent that Ortiz states opinions that constitute legal conclusions, the Court has not relied upon those opinions; whether Defendants' actions were reasonable is a question for the Court alone.  See Gutierrez v. City of San Antonio, 139 F.3d 441, 447 (5th Cir. 1998) ("We can still conclude, of course, that one expert accurately expresses what a reasonable police

genuine issue of material fact with regard to any of his § 1983 claims.  For the

reasons that follow, the Court finds that Plaintiff has not met his burden.

      1.    <u>Excessive Force</u>

      Plaintiff argues that Defendants violated his Fourth Amendment

rights when they used excessive force in the course of his arrest.  (Compl. ¶ 23.)

To defeat Defendants' qualified immunity on this claim, Plaintiff must overcome

<u>two levels of unreasonableness</u>.   First, Plaintiff must create a genuine question as

to whether Defendants "violated his constitutional right to be free from excessive

force," meaning he "must show '(1) an injury, (2) which resulted directly and only

from a use of force that was clearly excessive, and (3) the excessiveness of which

was clearly unreasonable.'"  <u>Ramirez v. Martinez</u>, 716 F.3d 369, 377 (5th Cir.

2013) (quoting <u>Rockwell v. Brown</u>, 664 F.3d 985, 991 (5th Cir. 2011)); <u>see also</u>

<u>Deville v. Marcantel</u>, 567 F.3d 156, 167 (5th Cir. 2009) (addressing

simultaneously the questions of whether the force was "excessive" or

"unreasonable").  Second, even if Plaintiff can establish a violation, the Court

---

officer would do, but we are not forced to so conclude by the mere presence of an
expert's opinion.").   The fact that some portions of Ortiz's affidavit may contain
inadmissible legal conclusions does not preclude the Court from considering other
portions of the affidavit.  <u>See</u> <u>Lee v. Nat'l Life Assur. Co.</u>, 632 F.2d 524, 529 (5th
Cir. 1980) ("The rule is settled that on a motion for summary judgment a court
will disregard only the inadmissible portions of a challenged affidavit offered in
support of or opposition to the motion and will consider the admissible portions in
determining whether to grant or deny the motion.").

must still "determine whether the law was clearly established at the time of [Defendants'] conduct," Ramirez, 716 F.3d at 377, such that "no reasonable officer" would have used that quantum of force, Brosseau v. Haugen, 543 U.S. 194, 201 (2004).

Whether the force used was "clearly excessive" and "unreasonable" depends on the "facts and circumstances of each particular case." Graham v. Connor, 490 U.S. 386, 396 (1989)). A court must make this determination "from the perspective of a reasonable officer on the scene, rather than with 'the 20/20 vision of hindsight.'" Ramirez, 716 F.3d at 377 (quoting Bush v. Strain, 513 F.3d 492, 502 (5th Cir. 2008)). Some relevant considerations include "whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." Id. As to the reasonableness inquiry, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397. In applying this standard, courts are also directed to consider "the fact that police officers are often forced to make split second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396–97. Again, this standard shields "all but the plainly incompetent officers or those who knowingly violate the law,"

Malley, 475 U.S. at 341, protecting officers from the sometimes "hazy border between excessive and acceptable force," Saucier, 533 U.S. at 206.

Importantly for present purposes, "[u]nder § 1983, . . . a government official can be held liable only for his own misconduct." Carnaby v. City of Houston, 636 F.3d 183, 189 (5th Cir. 2011) (citing Iqbal, 556 U.S. at 677). Thus, in determining whether the use of force was clearly excessive and clearly unreasonable, a court evaluates each officer's actions separately, to the extent possible. See Meadours v. Ermel, 483 F.3d 417, 421 (5th Cir. 2007) (holding, in § 1983 case, that "[t]he district court's decision to consider the officers' actions collectively because it found they acted in unison [went] beyond what prudence and case law allows").

### i.   Defendant Sizemore

It is undisputed that when Officer Sizemore arrived on the scene, there was a large and excited crowd in and around the elevator lobby of the parking garage. Sizemore attests that when he arrived, he observed several large groups of people both inside and outside the lobby area who were engaged in physical altercations. (Sizemore Aff. at 1–2.) Defendant Sizemore further attests that people were "pushing each other in and out of the lobby area." (Id. at 1–2.) Both the surveillance video and the YouTube video confirm that many of the individuals in the lobby were fighting. Plaintiff does not contest this

30

characterization of the scene; he conceded during his deposition that the scene

could be described as a "melee" and acknowledged that police officers "should

have contained the situation." (Zepeda Depo. 122:21–124:6.)

It is also undisputed that, by the time Sizemore first appeared on the

scene, (1) Plaintiff had already been involved in an altercation with three civilian

men who had punched him all over his body, including his ribs, head, and

shoulders (Zepeda Depo. 116:10–118:6); and (2) another officer or officers—not

Defendant Sizemore—were struggling with Plaintiff (Sizemore Aff. at 2; Zepeda

Depo. 119:7–120:3 (wherein Plaintiff explains that the first police officer to have

contact with him was a bicycle officer wearing shorts, which neither Defendant

was wearing)). Plaintiff also conceded that he had a "buzz" from the alcohol he

had drunk in the hour and a half leading up to the incident. (Id. at 39:24–40:9,

57:11–18.)

Defendant Sizemore states in his affidavit that it appeared to him that

Plaintiff was resisting arrest and that he believed that the other officers needed

assistance in restraining Plaintiff. (Sizemore Aff. at 2.) Sizemore attests that he

"identified [himself] to Zepeda and ordered him to place his hands behind his

back." (Id.) Sizemore further asserts that "Zepeda refused to comply with [his]

orders," "continued to pull his arms away and attempt to stand up," and "tried to

grab [Sizemore] and another officer while trying to kick with his feet." (Id.) In

light of Zepeda's "aggressiveness and violent behavior, and his refusal to follow commands," says Sizemore, he "struck Zepeda in his side in an attempt to gain compliance." (Id.) Nevertheless, Sizemore attests that Plaintiff "continued to ignore verbal commands and continued to push officers away . . . ." (Id.) The surveillance video and the YouTube video are not inconsistent with Sizemore's description.

The only evidence Plaintiff produces to controvert Sizemore's sworn statements and the contents of the videos is his deposition testimony. However, Plaintiff's testimony does not actually conflict with Sizemore's description of the incident. Plaintiff asserts in his Response that it is an "uncontested fact[]" that "Defendants arrived with many other police officers and began attacking Plaintiff," and he cites to page 48, lines 11–24, of his deposition. (Resp. at 3.) However, setting aside the fact that Defendants quite plainly do contest Plaintiff's claim that they "attacked" him, Plaintiff completely mischaracterizes the content of his deposition. That part of his deposition reads as follows:

> Q.     Okay. All right. You can go ahead and – and then you can see, I guess, a little bit of Officer Anguiano still in the frame at the very edge. Do you see that, can you point to that?
>
> A.     Yeah. And you'll see when he's trying to stop him from coming at me, because he's the one I think starts the whole thing by coming at me. Look. You can see him get his arm and try to stop him from coming at me. You never see me in an aggressive manner, attacking nobody, nothing. They come at me – two other people come and just attack me, take me to the floor. This guy and another guy that's just

> in free-world[13] clothes are going to be down there doing stuff to me too while –

(Zepeda Depo. 48:11–24.)  This, of course, is the part of Plaintiff's deposition in which he describes how Officer Anguiano tried to prevent three <u>non-defendants</u>, including the man in the yellow shirt, from attacking Plaintiff.  (<u>See also</u> <u>id.</u> 113:7–24 (wherein Plaintiff reaffirms that no SAPD officers had had physical contact with him by this point).)  None of these individuals were officers of the SAPD, and Defendants Sizemore and Barrientes <u>were not even on the scene yet</u>.  Indeed, just one minute later, Plaintiff testifies that when the police arrived, they must have seen this scuffle and mistakenly believed that he was one of the aggressors:

> A.    Yeah.  And the one in the yellow was just a parking attendant.  That's all he is is a parking attendant, just to park the cars, and he came in and doing an officer's job.  See, and I believe <u>that's the whole thing that started the situation, because he came and attacked me.  Officers get there, they see them attack me on the floor, and then, bam, they just attack me because they already seen me on the floor, you know, and so they think I'm the problem</u>, so they just go in there and try to handle the problem, you know, but they never knew what really happened.

(Zepeda Depo. 49:20–50:5 (emphasis added).)  In other words, Plaintiff admits that he was involved in a fight when the police arrived, concedes that the officers

---

[13] Plaintiff uses the term "free-world clothes" to mean "plain clothes," either plain-clothes officers or civilians.  (<u>See, e.g.,</u> Zepeda Depo. 48:15–49:23, 58:24–59:1, 116:20–25.)  The videos show that both Defendants were wearing SAPD uniforms on the night of the incident.

were "try[ing] to handle the problem," and concedes that, based on what the

officers saw when they arrived, they may have thought that he was "the problem."

(Id.)  Again, the video shows that Defendants Sizemore and Barrientes were not

among these officers that arrived on the scene first.

        At one point, Plaintiff appears to claim that Defendant Sizemore

struck him in the back of the head:

> Q.    All right.  Can you – I think I know the answer to this, but I need to ask you:  Can you tell us whether Officer Sizemore actually struck you or kicked you at any time?
>
> A.    He struck me in the back of the head.
>
> Q.    Okay.  He never kicked you though, right?
>
> A.    No.

(Zepeda Depo. 170:10–16.)  Seconds later, however, Plaintiff admits that he often

mixes up Defendant Sizemore and former-Defendant Bottiglieri.  In fact, says

Plaintiff, he is not sure who hit him in the head and can only tell by looking at the

videotapes:

> Q.    And how about Officer Bottiglieri, would – can you tell us what physical contact he had with you?
>
> A.    <u>I get him and Sizemore confused</u> because they look kind of familiar.  That's why I – I get them kind of confused with each other.  So I don't – I don't – I don't know what – I know – <u>I could tell you by the video who hit me</u>, you know what I'm saying, <u>but off the top of my head, no, I can't</u>.

(Zepeda Depo. 170:10–171:7 (emphases added).)  In other words, Plaintiff admits that he does not have an independent memory of Defendant Sizemore hitting him and that he relies on the tapes.  However, in neither videotape can Defendant Sizemore be seen striking Plaintiff in the head.[14]  Instead, the only person who can be seen striking Plaintiff in the head is the unidentified, bald officer described above.  (See YouTube video at 0:32.)  Moreover, earlier in his deposition, when asked to identify the "ball-headed [sic]" man on the screen, Plaintiff stated, "I think that's Sizemore."  (Zepeda Depo. 153:11–19.)  Again, Defendant Sizemore had a full head of hair at the time of the incident; it was the other officer—not a defendant in this case—who was bald.  In other words, Plaintiff appears to have been under the false impression that the bald man who hit him was Defendant Sizemore[15]; and thus his own testimony, together with the videos, discredits his claim that Defendant Sizemore struck him in the head.  See Poole, 691 F.3d at 625

---

[14]  Plaintiff did not specify in his Response to Defendants' Motion for Summary judgment when in the video(s) this alleged strike can be seen.  The Court has viewed each video over fifty times and has been unable to find it.

[15] Elsewhere, Plaintiff describes Sizemore as being about 5'10" tall and about 230 or 240 pounds.  (Zepeda Depo. 111:23–111:1.)  Someone of that height and weight would have a Body Mass Index of 33 and would be classified as obese. See Adult BMI Calculator, Center for Disease Control and Prevention, http://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html (last accessed August 29, 2013).  Judging from both videos, however, Defendant Sizemore is of approximately the same build as Plaintiff, who weighed 165 pounds at the time of the incident.

n.1 (noting that courts should view purported facts "'in the light depicted by the videotape'").

Plaintiff makes just one other mention of Sizemore's actions, stating that Sizemore and two other officers picked Plaintiff up and moved him to the corner of the room.  (Zepeda Depo. 124:15-125:1.) This corresponds to the same point in time: when Defendant Sizemore can be seen attempting to restrain Plaintiff by holding his right arm and the bald officer can be seen hitting Plaintiff in the upper back or head.  In sum, Plaintiff has presented no evidence, not even his own testimony, to contradict Defendant Sizemore's description of the actions he (Sizemore) took on November 1, 2009.

In light of all the circumstances, Defendant Sizemore's actions were objectively reasonable.  Again, the crowd in the lobby was excited, and many fights were taking place; it was important for the officers to defuse the situation as soon as possible and prevent the conflict from escalating.  Former Chief of Police Ortiz states in his affidavit that SAPD officers "are trained to bring a melee under control as quickly as possible in order to avoid the phenomenon known as 'group hysteria' from inciting bystanders to become involved and escalating an already dangerous situation."  (Ortiz Aff. at 4.)  "Among the[se] strategies," asserts Ortiz, "is to target the instigators or most aggressive combatants and remove them from the scene as quickly as possible."  (Id.)  In this way, others are "discouraged from

joining in the illegal and/or dangerous conduct because they realize the police will deal with their indiscretions quickly and arrest violators." (Id.)  The surveillance video shows that the situation in the parking garage lobby was extremely chaotic when Defendant Sizemore arrived, and Plaintiff appeared to be resisting a lawful arrest.  The situation was "tense, uncertain, and rapidly evolving," Graham, 490 U.S. at 396, and Defendant Sizemore's use of force was not "clearly excessive" to the need to overcome Plaintiff's apparent resistance to arrest and to lessen the risk of group hysteria.  See, e.g., Poole, 691 F.3d at 629 (holding that officer used reasonable force when he tasered the plaintiff to effect an arrest, because the plaintiff had "refus[ed] to turn around and be handcuffed, posed an immediate threat to the safety of the officers and actively resisted the officers' instructions"); Collier v. Montgomery, 569 F.3d 214 (5th Cir. 2009) (holding that arresting officer used reasonable force when he pushed suspect onto hood of police cruiser, resulting in bruising and chest pain; suspect physically resisted officer's attempt to handcuff him).

ii.   Defendant Barrientes

Plaintiff also fails to overcome Defendant Barrientes's qualified immunity.  Barrientes attests that on the night of the incident he "responded to an officer in trouble call," and as he approached the scene "there were several large groups of people both inside and outside the lobby area who were engaged in

physical altercations." (Barrientes Aff. at 1.)  Barrientes further attests that he "noticed several San Antonio police officers struggling with [Plaintiff]," who "was kicking out his feet while trying to break free from the officers." (Id. at 1– 2.)  Barrientes claims that he "grabbed control of [Plaintiff's] right arm while he continued to resist" and that he "struck [Plaintiff] in the chest in order to effect an arrest." (Id. at 2.)  When Plaintiff "continued to struggle despite continued orders to stop resisting," Barrientes attests that he "moved to [Plaintiff's] left side and placed him in a restraint hold using [his] right arm to control and bring [Plaintiff] to the ground."  The surveillance video shows that Barrientes held Plaintiff in this manner for approximately twelve seconds, while other officers attempted to control Plaintiff's flailing legs.  (Id.)  Barrientes states that, "[w]ith the help of other officers, [he] was able to turn [Plaintiff] onto his stomach." (Id.)  Once the officers have flipped Plaintiff onto his stomach, the surveillance video shows Barrientes pinning Plaintiff to the ground with his knee while four other officers attempt to handcuff Plaintiff.  Barrientes attests that he stood up as soon Plaintiff was handcuffed (Barrientes Aff. at 2), which the video shows was approximately fifteen seconds later.  The video also shows that Plaintiff immediately attempted to flip back over, leading Barrientes to roll Plaintiff back onto his stomach and again use his knee to pin Plaintiff to the ground.  (Id.)

Again, Plaintiff does not present much evidence to controvert Barrientes's description of that night's events.  In fact, Plaintiff testified that he could not say whether Barrientes had had any contact with him at all:

> Q.    And how about Officer Barrientos [sic], can you tell us what physical contact he had with you?
>
> A.    No, I can't.

(Zepeda Depo. 170:17–19.)  In other words, Plaintiff does not explicitly contest any of Barrientes's assertions or clearly state that Defendant Barrientes is responsible for a particular injury.

Nevertheless, construing all evidence in favor of the non-movant, as the Court must, Plaintiff does refer to an action that can be traced to Barrientes: He testifies that an officer pinned him down with his knee and that this injured his neck:

> Q.    What – how was your neck injured?
>
> A.    Well, I guess when I'm right here, the officer has his knee and his whole weight – I'm like this.  I'm already handcuffed and he has his whole body weight and his knee on my neck and my face.

(Zepeda Depo. 68:20–24.)  Similarly, while Plaintiff never discusses the choke hold that the surveillance video shows Defendant Barrientes using on him (either by describing the hold Barrientes used or by describing any pain he experienced),

the Court will consider the choke hold in its analysis of the force Barrientes

used.[16]

----

[16]  The Court emphasizes that Plaintiff never testifies that the named Defendants
(as opposed to other individuals or the SAPD officers as a group) did anything to
him that was not captured on the surveillance video.  Instead, Plaintiff merely
makes broad, general statements that all of the officers were constantly hitting and
kicking him, a claim that is not supported by the videos.  Indeed, Plaintiff
conceded at his deposition that he was not even sure that any SAPD officer—
much less the named Defendants—had ever kicked him:

> Q.    [H]e [an unidentified police officer] wasn't striking you at that point,
> was he?
>
> A.    I think he was.
>
> Q.    How could you distinguish between him and any of the other three
> individuals that were there as the –
>
> A.    Because he already stood up.
>
> Q.    All right.  Well, how can you distinguish between the police officer
> and the other – the individual in the yellow shirt and the other
> individual as to who was attacking you?
>
> A.    I guess I was just getting hit all over the body.  I just – just – I guess
> that's it.
>
> [ . . . ]
>
> Q:    So everything leading up to [when you were handcuffed], you didn't
> know who was doing what?
>
> A:    No.  I just know I was getting hit by all sorts of people.
>
> [ . . . ]
>
> Q.    Did any law enforcement officer, during this entire incident, kick
> you, other than [the unidentified individual on the YouTube video]?
>
> A.    I can't say yes and I can't say no.  I mean, I—I just know that I got
> hit a lot of times.
>
> [ . . . ]

a.  <u>Injury Resulting Directly and Solely from</u>

<u>Defendant's Actions</u>

First, the Court notes that Plaintiff has not produced medical records

to support his contention[17] that he suffered more than a <u>de minimis</u> injury to his

neck or throat that resulted directly and solely from Defendant Barrientes's

actions.  <u>See</u> <u>Ramirez</u>, 716 F.3d at 377 (explaining that a plaintiff must show an

injury that "resulted <u>directly</u> and <u>only</u> from a use of force that was clearly

excessive") (emphases added); <u>Tarver v. City of Edna</u>, 410 F.3d 745, 752 (5th Cir.

2005) ("Although we no longer require 'significant injury' for excessive force

claims, the injury must be more than <u>de minimis</u>.") (citation omitted) (quoting

<u>Williams v. Bramer</u>, 180 F.3d 699, 703 (5th Cir. 1999)).  The only medical

records Plaintiff produces are from a visit to Dr. Pablo Guajardo on May 6, 2010,

over seven months after the November 1, 2009 incident.  (<u>See</u> Resp. Ex. 2.)

Notably, while Plaintiff asserted in his October 30, 2012 deposition that he still

suffered from all the same injuries he allegedly incurred the night of the

---

Q.     [Y]ou can't say that any San Antonio Police officer kicked you that
       night, correct?

A.     Correct. [ . . . ]

(Zepeda Depo. 122:8–20; 129:2–5; 133:9–13.)

[17] Again, the Court merely <u>presumes</u> that Plaintiff is alleging that Defendant
Barrientes injured his neck, because Plaintiff does not explicitly assert that
Defendant Barrientes is responsible for a particular injury or even that he knows
what contact Barrientes had with him.

incident—"[e]verything," including "throat problems" (Zepeda Depo. 76:21–
77:8)—Dr. Guajardo's notes directly contradict this assertion.  Dr. Guajardo noted
on May 6, 2010—over five months <u>before</u> Plaintiff made that statement during his
deposition—that Plaintiff's neck was "supple."  (Resp. Ex. 2.)  Dr. Guajardo made
no other mention of Plaintiff's neck or throat under the heading "Physical
Examination," which contains notes from a full-body examination.  (<u>Id.</u>)  Notably,
while Dr. Guajardo wrote that Plaintiff had claimed the November 1, 2009 arrest
had hurt his shoulder, he did not write that Plaintiff claimed the incident had hurt
his neck or throat.  (<u>Id.</u>)

      While Plaintiff asserts that he went to the emergency room on the day
following the incident (Zepeda Depo. 14:9–12; <u>id.</u> at 70:5–22), he has not
produced medical records from that visit or explained why such records are not
available.  Defendants, however, have produced medical records from Plaintiff's
visit to Dr. Donald Wong on December 8, 2009, five weeks after the incident.
(Mot. Ex. H at 10.)  Again, while Plaintiff claims his injuries continued to plague
him even in 2012, Dr. Wong did not mention that Plaintiff had any neck or throat
injury.  (<u>Id.</u>)  Indeed, the only symptom Dr. Wong notes is left shoulder pain,
which he writes that Plaintiff has been suffering for just <u>two</u> weeks—not five
weeks, as would have been the case had Plaintiff been injured on the night of
November 1, 2009.  (<u>Id.</u>)  Once again, therefore, Plaintiff's medical records

directly contradict his vague assertions that Defendant Barrientes injured him—

whether that injury was to his neck, throat, or shoulder—on the night of

November 1, 2009.

Just as importantly, Plaintiff has produced no evidence to suggest that

any injury he may have suffered resulted "only" from Defendant Barrientes's

actions.  Particularly in light of (1) Plaintiff's own testimony about the severe

beating he received from the three civilian men who are not defendants in this

case[18] and (2) Plaintiff's failure even to make a sworn statement that a particular

---

Q.   And are all three of those [non-Defendants] throwing punches at you during that time?

A.   Yes, sir.

Q.   Okay.  And are they kicking you also?

A.   Yes, sir.

Q.   And are they – where are they hitting you with those punches and kicks?

A.   My upper body and my lower body, all over.

Q.   All over you body?

A.   Yeah.

Q.   And how many – and I take it that they're throwing those pretty fast and pretty hard; would that be correct?

A.   Yes, sir.

Q.   Okay.  And I take it that they're kicking you pretty fast and pretty hard; is that true also?

A.   Yes, sir.

Q.   And they're kicking you all over your upper body and your lower body at that time?

injury resulted directly and solely from Defendant Barrientes's actions, Plaintiff
has failed to create a genuine factual dispute as to the these elements.   See
McClure v. Boles, 490 F. App'x 666, 667 (5th Cir. 2012) ("[A] nonovant may not
overcome the summary judgment standard with conclusional allegations,
unsupported assertions, or presentation of only a scintilla of evidence.") (citing
Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007)).

b.   Objective Unreasonableness

Even assuming arguendo that Plaintiff did suffer some
non-de minimis injury that resulted directly and solely from Defendant
Barrientes's actions, Plaintiff simply has not created a genuine fact question as to
whether Barrientes's actions were objectively unreasonable under the
circumstances.

First, Plaintiff has produced no evidence to suggest that Barrientes's
use of a chokehold was objectively unreasonable.  "[C]hoke-holds in themselves
are not legally impermissible."  Stogner v. Sturdivant, 515 F. App'x 280, 281 n.1
(5th Cir. 2013).  Instead, the Fifth Circuit has repeatedly held that it was not

---

A.     Yeah, and on my ribs.

Q.     And are they also hitting you in the head?

A.     Yeah, back of the head, on the shoulders.  I mean, I got hit
       everywhere.

(Zepeda Depo. 117:9–118:6.)

objectively unreasonable for a police officer to employ a choke hold where the suspect was physically resisting arrest.  In Gassner v. City of Garland, 864 F.2d 394, 400 (5th Cir. 1989), for example, the Fifth Circuit upheld an officer's use of a chokehold where the plaintiff had "resisted [the officer's] attempt to spread-eagle him against the car, and . . . this resistance continued until [the officer] put him in a chokehold, wrestled him to the ground, and handcuffed him."  Id. at 400; see also Wagner v. Bay City, Tex., 227 F.3d 316, 324 (5th Cir. 2000) (agreeing that "nothing about the use of . . . a choke-hold was objectively-unreasonable conduct where the suspect physically resisted arrest").

   In this case, Barrientes only placed Plaintiff in a choke hold after many officers working together were unsuccessful in subduing Plaintiff, who appeared to be resisting arrest.  Even then, Barrientes only held Plaintiff in a choke hold for twelve seconds, releasing him as soon as he and the other officers had flipped Plaintiff onto his stomach.  Plaintiff did not testify that the choke hold prevented him from breathing, that he lost consciousness, or that Barrientes did anything that would have made this particular choke hold more dangerous than any other.  Indeed, as previously noted, Plaintiff does not even mention or describe the choke hold at any point in his deposition; he merely states that he "got choked a lot of times" without clarifying whether he was choked by

Defendant Barrientes, another officer, or one of the three civilian men who attacked him.  (Zepeda Depo. 133:9–16.)

In addition, while Plaintiff claims that he "didn't attack back" at any point, even before he realized the men were police officers (Zepeda Depo. 128:15–129:17; id. at 155:6–11; id. at 139:2–18), his own testimony indicates that he did act in such a way that a reasonable officer could have believed he was resisting arrest.  For example, Plaintiff agreed at his deposition that he was not compliant with the officers' attempts to take his arms and put them behind his back.  (Id. at 176:23–177:2; id. at 178:2–18.)  He also testified that when the officers attempted to handcuff him he "turn[ed] around . . . because [he] didn't even know they were cops" and acknowledged that this is what led them to "jump on [him] again . . . ." (Id. at 156:4–12; see also id. 158:1–5 ("Until I got handcuffed is when I knew I was – there was SAPD, and then that's when I turned around and, boom, they went on me again.").)  The surveillance video confirms that Plaintiff struggled with the officers, flailing his arms and legs around, requiring many officers to work together to subdue him.  See Poole, 691 F.3d at 631 (admonishing the dissent for "accept[ing] [the plaintiff's] assertion that he did not actively resist the officers' commands" when that assertion was "plainly contradicted by the videotape"; in so doing, the dissent had "fail[ed] to consider [the plaintiff's] actions from the perspective of a reasonable officer").  In light of

the circumstances, therefore, a reasonable officer could have decided that a choke hold was necessary to subdue Plaintiff.

Similarly, there is no bright-line rule forbidding police officers from using a knee to pin an arrestee to the ground.  In Castillo v. City of Round Rock, Texas, for example, the Fifth Circuit held that officers had not used excessive force where they had restrained plaintiff "in the prone position on the ground, eventually handcuffing his hands behind his back," even though (1) one officer and a bystander "remained on [plaintiff's] back for four to six minutes"; (2) the officer "shoved his knee in the back of [plaintiff's] neck and kept it there for some five to ten minutes"; and (3) the plaintiff later died of asphyxiation.  177 F.3d 977, at *1 (5th Cir. 1999) (unpublished).  The Court explained that the plaintiff had "actively resist[ed] by kicking and yelling" and had bloodied one officer's nose "in a manner that a reasonable officer could perceive as hostile."  Id. at *3.  The officers had not acted unreasonably when they placed the plaintiff in the prone position and "incapacitat[ed] him as quickly and professionally as possible, by climbing on top of his back and securing his hands and legs . . . ."  Id.  Similarly, in Deshotels v. Marshall, 454 F. App'x 262 (5th Cir. 2011), the court held that police officers acted reasonably when one officer kneeled on arrestee's right shoulder, another straddled his back and pulled on his arm, and the third folded arrestee's legs together to stop him from kicking—even though the arrestee died

47

of asphyxia shortly thereafter.  Id. at 268.  The court noted that the arrestee, a large

man, had resisted arrest, first by attempting to run away and then by continuously

"pulling his arms under his chest."  Id..

In this case, a reasonable officer could have believed that it was

appropriate to pin Plaintiff to the ground with his knee.  First, as previously

described, a reasonable officer could have interpreted Plaintiff's actions as

resistance to arrest: Barrientes asserts that Plaintiff "thrashing around on the

ground, turning on his back and stomach" (Barrientes Aff. at 2), and Plaintiff

himself admitted that he pulled his arms away and attempted to turn around when

the officers tried to handcuff him.  The video shows that Plaintiff was putting up

such a struggle that it took multiple officers—as many as seven, at one point—to

bring him under control.  Thus, just as in Castillo and Deshotels, a reasonable

officer could have believed that Plaintiff was resisting arrest with sufficient

physical force that it was necessary and appropriate to pin him to the ground with

a knee.  The video shows that Barrientes did so at first for a mere fifteen seconds

and that he stood up as soon as Plaintiff was handcuffed.  This, of course, is a

much less serious use of force than the actions found to be reasonable in Castillo,

wherein the officer "shoved his knee in the back of [plaintiff's] neck and kept it

there for some five to ten minutes." 177 F.3d 977, at *1 (emphasis added).

Moreover, the fact that Barrientes stood up as soon as Plaintiff was handcuffed

strongly suggests that Barrientes used his knee only insofar as it was necessary to effect Plaintiff's arrest.  Thus, in light of Plaintiff's apparent resistance to arrest, Barrientes's decision to pin Plaintiff to the floor with his knee, freeing his hands to help with handcuffing Plaintiff, was neither excessive nor objectively unreasonable.

While Barrientes pinned Plaintiff with his knee again a few seconds later, he did so only after Plaintiff <u>again</u> appeared to be resisting arrest: The surveillance video shows Plaintiff flailing his legs and attempting to flip himself over onto his back as soon as the officers stand up.  Moreover, while Barrientes held Plaintiff in the prone position for longer than he did the first time, Plaintiff does not testify that he was pinned in that manner for longer than a few minutes, that he could not breathe, that he was screaming in pain, or that he was pleading with Barrientes to let him sit up.  Instead, Plaintiff confirmed that he "never said anything" to Barrientes or the other officers while he was pinned to the ground and that he was permitted to sit up shortly thereafter:

> Q.   After you realized that you were dealing with law enforcement officers, did you say anything to them?
>
> A.   Yeah.  What did I do wrong?
>
> Q.   Okay.  But up – okay.  Anything else?
>
> A.   No.
>
> Q.   That's it?
>
> A.   Yeah.  I was just, What did I do, why am I getting arrested?  That's when I was sitting down over here.

Q.     Okay.  How about prior to the – you're talking about actually after everything had calmed down and you were actually sitting up next to the elevator wall?

A.     Yeah.  Yeah.

Q.     How about prior to that time?

A.     No.  They just stayed like that on me.

Q.     Okay.  And you never said anything to them?

A.     No.

(Zepeda Depo. 159:10–160:3.)  Plaintiff concedes that he was not mistreated once he was permitted to sit up.  (Id. at 197:23–198:3.)

Plaintiff asserted during his deposition that Barrientes "[had] his whole body weight and his knee on my neck and my face" (Zepeda Depo. 68:20–24.), though it is not clear whether Plaintiff is referring to the first knee-pin or the second.  In the surveillance video, Barrientes appears to be crouching in such a way that much of his weight is supported by his left foot.  Nevertheless, even assuming the truth of Plaintiff's allegation—i.e., assuming that Barrientes did use his whole body weight to pin Plaintiff to the ground—Plaintiff's excessive-force claim against Barrientes fails.

First, for the reasons given above, Plaintiff has not provided competent summary-judgment evidence of an injury that resulted directly and solely from Barrientes's actions, meaning he has not created a genuine factual dispute regarding an essential element of an excessive-force claim.

Second, even assuming *arguendo* that Plaintiff had shown such an injury, he has not overcome Barrientes's qualified immunity, because he has not shown that Barrientes's alleged actions were objectively unreasonable under clearly established law at the time of the incident.  See Pfannstiel v. City of Marion, 918 F.2d 1178, 1183 (5th Cir. 1990) ("Even if a defendant's conduct actually violates a plaintiff's constitutional rights, the defendant is entitled to qualified immunity if the conduct was objectively reasonable.").  While the right to be free from the use of excessive force was, of course, clearly established, it was not clear at the time of the incident (nor is it now) that pinning someone who was resisting arrest with one's knee—even applying one's "whole weight"— would constitute excessive force.  Again, the Fifth Circuit held in Castillo that officers were entitled to qualified immunity even where one had "shoved his knee in the back of [plaintiff's] neck and kept it there for some five to ten minutes" (and even where the plaintiff later died of asphyxiation), because the plaintiff had been struggling with officers and resisting arrest.  177 F.3d 977, at *1.  Here, in light of the fact that Plaintiff (1) had been resisting arrest to such a degree that multiple officers had to work together to subdue him and (2) had flailed his legs and attempted to roll himself over even after he had been handcuffed and the officers had stood up, the Court simply cannot conclude that "no reasonable officer" in Defendant Barrientes's situation would have thought that he needed to use most of

his weight to pin Plaintiff to the ground until the situation was fully under control. Brosseau, 543 U.S. at 201; see also Zarnow, 500 F.3d at 407–08 ("If reasonable public officials could differ as to whether the defendants' actions were lawful, the defendants are entitled to immunity.") (citing Malley, 475 U.S. at 341) (emphasis added); Thompson, 245 F.3d at 457 ("The defendant's acts are held to be objectively reasonable unless all reasonable officers in the defendant's circumstances would have then known that the defendant's conduct violated the United States Constitution . . . ."). At most, Defendant Barrientes's actions fall within that "hazy border between excessive and acceptable force," Saucier, 533 U.S. at 206, which is precisely the kind of situation in which qualified immunity is meant to protect police officers from civil liability.

For the reasons given, Defendant Barrientes is entitlemed to qualified immunity on Plaintiff's excessive-force claim.[19]

2.    False Arrest

Plaintiff alleges that Defendants Barrientes and Sizemore violated his Fourth Amendment rights when they falsely arrested and detained him. (Compl. ¶ 23.) Again, however, both Defendants are entitled to qualified immunity.

---

[19] To the extent that Plaintiff asserts that Defendants violated his Fourth Amendment rights by seizing him in an unnecessarily cruel or painful manner, this claim is subsumed by Plaintiff's excessive-force claim. Accordingly, Defendants are also entitled to qualified immunity as to this claim.

An arrest is unlawful unless it is supported by probable cause.  Flores v. City of Palacios, 381 F.3d 391, 402 (5th Cir. 2004).  "Probable cause is present 'when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense.'"  Vance v. Nunnery, 137 F.3d 270, 276 (5th Cir. 1998) (quoting United States v. Levine, 80 F.3d 129, 132 (5th Cir. 1996)).  Thus, Defendants are entitled to qualified immunity for their arrest of Plaintiff "'if a reasonable person in their position could have believed he had probable cause to arrest.'"  Deville v. Mercantel, 567 F.3d 156, 166 (5th Cir. 2009) (citing Goodson v. City of Corpus Christi, 202 F.3d 730, 740 (5th Cir. 2000)).

For the reasons given above, a reasonable person in Defendants' position could have believed he had probable cause to arrest Plaintiff.  Again, by the time the Defendants arrived on the scene, many people were fighting in the lobby, and other officers were struggling with Plaintiff.  Plaintiff appeared to be resisting those officers' attempts to place handcuffs on him.  Even Plaintiff conceded that it probably appeared to the police that he had been fighting with other men or even attacking his female friend:

A.     There was a whole bunch of females there but, you know, it was Jessica and that girl that were, you know, that had started, you know, kind of arguing.  And as soon as they started arguing, I said – he told us to go in that building and then he tried keeping this girl in there;

well, then, this girl was trying to come in here, she's trying to go out, I'm trying to hold her, and then, <u>I guess they think I'm probably doing something to Jessica</u>, and that's when the cops just started, you know…

(Zepeda Depo. 41:12–21 (emphasis added).)

A.    Yeah.  And the one in the yellow was just a parking attendant.  That's all he is is a parking attendant, just to park the cars, and he came in and doing an officer's job.  See, and I believe that's the whole thing that started the situation, because he came and attacked me.  <u>Officers get there, they see them attack me on the floor, and then, bam, they just attack me because they already seen me on the floor, you know, and so they think I'm the problem</u>, so they just go in there and try to handle the problem, you know, but they never knew what really happened.

(Zepeda Depo. 49:20 – 50:5 (emphasis added).)

In light of these circumstances, a reasonable officer could have believed that he had probable cause to arrest Plaintiff for, <u>inter alia</u>, assault and resisting arrest.  Accordingly, Defendants are entitled to qualified immunity on Plaintiff's false-arrest claim.

3.    <u>Failure to Intervene</u>

Plaintiff alleges that Defendants violated his Fourth Amendment rights by failing to intervene where such intervention would have prevented Plaintiff's injuries.  (Compl. ¶ 23.)  "[A]n officer may be liable under § 1983 under a theory of bystander liability where the officer '(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.'"  <u>Whitley v. Hanna</u>, -

54

-- F.3d ----, 2013 WL 4029134, at *11 (5th Cir. Aug. 8, 2013) (quoting Randall v.
Prince George's Cnty., Md., 302 F.3d 188, 204 (4th Cir. 2002)); accord Hale v.
Townley, 45 F.3d 914, 919 (5th Cir. 1995).

          Again, however, Plaintiff simply has not presented sufficient
evidence to overcome Defendants' qualified immunity.  While a
failure-to-intervene claim implies that a defendant stood idly by while a fellow
officer used clearly excessive force on a plaintiff, the two videos flatly contradict
any such notion.  At the time of the kick by the unidentified officer, Sizemore can
clearly be seen looking in a different direction, and Barrientes was not even on the
scene yet.  While Sizemore may have seen the bald officer hitting Plaintiff, there
is no reason to think that Sizemore had the opportunity or ability to stop him: The
officer acted over the course of just seconds and at a time when the lobby was full
of people and the situation was very chaotic.  Nor is there any reason to believe
that Defendants witnessed other incidences of excessive force and failed to act
when doing so was clearly unreasonable.  See Hale, 45 F.3d at 918 (finding that
plaintiff had raised a genuine issue of material fact as to whether defendant had
failed to intervene where defendant "stood by and laughed as [another officer]
slammed [plaintiff] against the car; rammed his fist into [plaintiff's] testicles; and
repeatedly tried to slam [plaintiff's] head into the car").  Instead, as described
above, the videos make clear that by the time the two Defendants arrived on the

scene, their fellow officers were attempting to subdue Plaintiff, and Defendants had reason to believe that Plaintiff had either recently committed a crime and/or was resisting arrest.  Many fights were taking place in the lobby, and the officers were working quickly to control the situation.  In addition, the surveillance video does not support Plaintiff's assertion that the officers continuously punched, kicked, and choked him.  See Carnaby, 636 F.3d at 187 ("A court . . . need not rely on the plaintiff's description of the facts where the record discredits that description but should instead consider the facts in the light depicted by the videotape.") (internal quotations omitted).  Thus, Plaintiff has provided no evidence that Defendants Sizemore and Barrientes were aware of any other officers using excessive force on Plaintiff or that they failed to stop other officers from using excessive force even though they had the opportunity to do so.  See Whitley, 2013 WL 4029134, at *11.  Under the totality of the circumstances with which the officers were confronted, Defendants' actions were objectively reasonable, and they are entitled to qualified immunity on this claim.

> B.   Plaintiff's Malicious-Prosecution Claim Fails as a Matter of Law

Plaintiff alleges that Defendants violated his Fourth Amendment rights by falsely and maliciously charging him with the commission of crimes without probable cause to believe that such crimes had occurred.  However, this argument is foreclosed by the Fifth Circuit's decision in Castellano v. Fragozo,

352 F.3d 939, 958 (5th Cir. 2003).  In Castellano, the Court noted that initiating

criminal charges without probable cause may set in motion events that run afoul of

an explicit constitutional protection—the Fourth Amendment if the accused is

seized and arrested, for example, or other constitutionally secured rights if a case

is pursued further.  However, the Fifth Circuit held that there is no freestanding

claim under 42 U.S.C. § 1983 for malicious prosecution.  Id. at 945; see also

Deville v. Marcantel, 567 F.3d 156, 169 (5th Cir. 2009) (granting summary

judgment on plaintiff's § 1983 malicious-prosecution claim because such a claim

is not "independently cognizable" in light of the Fifth Circuit's holding in

Castellano); Price v. City of San Antonio, Tex., 431 F.3d 890, 895 (5th Cir. 2005)

(acknowledging "Castellano's conclusion that 'malicious prosecution' alone does

not state a federal claim").  In this case, Plaintiff has not alleged that he suffered

any constitutional violation as a result of the allegedly malicious prosecution: The

charges were eventually dropped, and Plaintiff did not serve any jail time based on

those charges.  See Gonzalez v. City of Corpus Christi Tex., Civ. A. C-10-321,

2011 WL 147741, at *4 (S.D. Tex. Jan. 18, 2011) (holding, under Castellano, that

"[t]he allegations that Defendants charged Plaintiff with resisting arrest, search or

transport, and two counts of felony assault are not alone enough to support a

§ 1983 malicious prosecution claim, even if Defendants lacked probable cause and

even if the charges terminated in Plaintiff's favor"; plaintiff had to show that the

initiation of criminal charges set in motion events that ran afoul of an explicit

constitutional protection).  While Plaintiff asserts that he has satisfied the

requirements described in <u>Castellano</u> by pleading that he was subjected to

excessive force and unlawful arrest on November 1, 2009 (Resp. at 17), those

events all took place <u>before</u> the allegedly malicious prosecution, and thus any

constitutional violation alleged to have occurred that evening could not have

resulted from the prosecution itself.  Accordingly, Plaintiff's attempt to assert a

freestanding § 1983 malicious-prosecution claim fails as a matter of law.

<u>CONCLUSION</u>

For the foregoing reasons, the Court **GRANTS** Defendants' Motion

for Summary Judgment.

**IT IS SO ORDERED.**

**DATED:** San Antonio, Texas, August 30, 2013.

_____
David Alan Ezra
Senior United States District Judge